## A03A1319. FERGUSON v. THE STATE.
### (584 SE2d 618)

BLACKBURN, Presiding Judge.

Following his conviction by a jury of robbery by intimidation, Ramon Earl Ferguson appeals, arguing that (1) the evidence was insufficient to sustain the verdict, and that the trial court erred (2) in admitting certain evidence, and (3) by denying his ineffective assistance of counsel claim. For the reasons that follow, we find no error and affirm.

1. Ferguson contends that the evidence was insufficient to sustain his conviction. We disagree. On appeal from a criminal conviction, the evidence must be viewed in a light most favorable to the verdict, and an appellant is no longer entitled to a presumption of innocence. *Pollard v. State*.[1] The jury's verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Hogan v. State*.[2]

So considered, the evidence established that, on the night of January 3, 1999, Talicia Lane was working alone at a convenience store in Columbia County. At approximately 11:00 p.m., Ferguson walked around the counter, handed Lane a piece of paper, and said, "[h]ere, I

---

[16] (Citation and punctuation omitted.) *Asbury v. Ga. World Congress Center*, 212 Ga. App. 628, 632 (4) (442 SE2d 822) (1994).

[1] *Pollard v. State*, 230 Ga. App. 159 (495 SE2d 629) (1998).

[2] *Hogan v. State*, 210 Ga. App. 122, 123 (1) (435 SE2d 494) (1993).

need you to read this." The note said, "I have a gun, give me your money." When Lane did not respond, Ferguson started yelling, "I'm not playing. I have a gun. I will shoot you. Give me the money." At that point, Lane removed over $230 from the register and handed it over to him.

After Ferguson left with the note and the money, Lane summoned the police. She described the robber as a black male, forty to fifty years old, about six feet tall, with a medium build and a thin mustache. She told investigators that he was wearing a baseball cap, a black jacket, and a white shirt. Three days after the robbery, when shown a photo array, Lane recognized Ferguson and selected his photograph. Lane also identified Ferguson in court. Investigators obtained photographs taken by a security camera, one of which an officer termed, a "picture of value."

The chief forensic document examiner at the State Crime Lab, Arthur T. Anthony, testified as an expert. Anthony, a board-certified document examiner, conducted testing on a lined notepad found in the vehicle that Ferguson was using. By studying indentations that appeared on a blank sheet of paper from the notepad, Anthony was able to discern "the wording of 'I' then the words 'have a gun,' 'cash.' "

The State also presented two similar transactions that occurred earlier on the same day, one in Richmond County and the other in Aiken, South Carolina. In the first similar incident, Glenda Freeman was working alone at a convenience store in Richmond County when a black male entered and told her that he had car trouble. Freeman noticed his car was blue. After the man seemed perplexed by the problem, he told Freeman that his car might just need gas. When Freeman offered some money to buy gas, the man retorted that he wanted the money bag; after removing cash from that bag, he left. She described the robber as a black male, about six feet tall, wearing a dark baseball cap and a dark coat.

In the second incident, Robin Nunez, an employee at a convenience store in Aiken, South Carolina, testified that between 8:00 p.m. and 9:30 p.m., as she worked alone, a man tried to purchase beer. After being told that he could not buy beer on a Sunday, he left. Minutes later, he returned. After paying for a snack, "he stuck a piece of paper in my face." On what she described as a piece of white, lined paper was written, "I have a gun, give me the money." Nunez refused to do so and fled to a back office, where she locked the door. As she called 911, she watched the man on a surveillance monitor. He left, taking his note with him. She described the would-be robber as a black male, 35 to 40 years old, and 6' 1" in height. She told police he was wearing a black baseball cap, black jacket zipped up, and black sweatpants "with lines down the sides of them." Later, from a photo array, Nunez selected Ferguson's photograph. She identified Fergu-

son in court as the perpetrator. Investigators obtained the surveillance tape from the Aiken store.

In a collaborative effort spanning jurisdictional boundaries, law enforcement officials arranged for footage from surveillance videos depicting the Richmond County and Aiken incidents to be shown on local television on January 5. Police elicited the public's help in identifying the perpetrator. A male caller identified Ferguson as the robber and told Investigator Bill Kitchens that Ferguson's wife would soon be in contact with police. Kitchens testified that about an hour after that telephone call, Suzette Ferguson arrived. He testified that after viewing part of the video, Mrs. Ferguson said that the man looked like her husband. Kitchens asked her to page him when Ferguson came home.

After her page and with her permission, Kitchens searched Mrs. Ferguson's car that Ferguson had been driving. Mrs. Ferguson confirmed that she had authorized a search of her car because "there was nothing I figured he had to hide." Inside her blue Mitsubishi Galant, investigators discovered the lined notepad that provided the basis for the forensic document expert's testimony about the threatening note. A black jacket and a pair of black nylon jogging pants with white stripes down the sides that were also found were similar to the attire described by the clerks and worn by the man in the videos. The jury was shown the surveillance videotapes from the attempted robbery in Aiken and the photographs created from the security camera in the Richmond County robbery. This evidence more than amply supported Ferguson's conviction for robbery by intimidation. See *Studdard v. State*.[3]

2. Ferguson contends that the trial court erred in admitting the similar transaction evidence. He points out that the clerk in the Richmond County incident was unable to identify him as the robber. He argues that the robbery in Richmond County lacked any logical connection to the indicted offense because it involved the use of some physical force and did not include a written demand.

"A defendant does not have to be positively identified as the perpetrator of a similar transaction. Rather, circumstantial proof may be used to establish his connection to it. And, that connection does not have to be proven beyond a reasonable doubt." (Citation omitted.) *Johnson v. State*.[4] Both incidents involved robberies of a female victim working alone at a convenience store on the same day. The clerk's description of the robber's clothing and physical appearance resembled that of the perpetrator of the indicted offense. The clerk's

---

[3] *Studdard v. State*, 185 Ga. App. 319, 320 (1) (363 SE2d 837) (1987).
[4] *Johnson v. State*, 236 Ga. App. 252, 254 (1) (a) (511 SE2d 603) (1999).

description of the car seemed to match that of the one that Ferguson was driving. In addition, the incident in Richmond County was one in a series of convenience store robberies that occurred close in time and place. See *Tutt v. State*.[5] Although this evidence may not have been sufficient to prove Ferguson's guilt beyond a reasonable doubt in the Richmond County incident, it did establish his connection to that offense. See *Elder v. State*.[6] In any event, even if erroneous, the admission of this evidence was harmless because other evidence overwhelmingly supported the jury's verdict, including the victim's identification of Ferguson. See *Watkins v. State*.[7]

3. Ferguson contends that the trial court erred by permitting the State to introduce improper hearsay. He claims that the investigator's testimony about the comments of a telephone caller who did not testify at trial constituted impermissible hearsay that directly implicated him "as the subject who committed these crimes" and "amounted to harmful error." See *White v. State*.[8]

In the testimony at issue, Kitchens testified that, after the video appeared on television, "we received a call at our department in reference to a gentleman that had called us and said he had seen the video on TV. He said he knew the guy on the video. . . . I received a number to call this gentleman. I called him. He said he knew the guy in the video and gave me some information about who he is. He also advised me that this person — ." At that point, Ferguson interrupted the testimony and objected on the basis of improper hearsay. After the trial court overruled the objection, Kitchens continued: "Okay. I received information from a male subject who called us. He gave me the name of the guy he said it was on the video. He also told me that this person's wife would be in contact with us. As a result of that, indeed, Suzette Ferguson did come down to see us." Admission of the testimony that "[the caller] knew the guy on the video" and that the caller said that "this person's wife would be in contact with us" was error. See *Brown v. State*.[9] Rarely can the hearsay exception be used "to explain conduct," since otherwise the exception would "become imprimatur for the admission of rumor, gossip, and speculation." *Britton v. State*.[10]

But, "[p]roof of the same fact by legally admissible evidence renders harmless admission of incompetent or inadmissible evidence." *Butler v. State*.[11] Before Kitchens took the stand, Mrs. Ferguson had

---

[5] *Tutt v. State*, 165 Ga. App. 715, 716 (1) (302 SE2d 580) (1983).

[6] *Elder v. State*, 249 Ga. App. 868, 869 (549 SE2d 825) (2001).

[7] *Watkins v. State*, 206 Ga. App. 701, 704 (1) (426 SE2d 238) (1992).

[8] *White v. State*, 273 Ga. 787, 788 (1) (546 SE2d 514) (2001).

[9] *Brown v. State*, 274 Ga. 31, 37-38 (2) (549 SE2d 107) (2001).

[10] *Britton v. State*, 257 Ga. App. 441, 442 (1) (571 SE2d 451) (2002).

[11] *Butler v. State*, 172 Ga. App. 405, 407 (2) (323 SE2d 628) (1984).

testified without objection that she had received a telephone call from a person asking if she had seen the news, "that there was a photograph that appeared to be my husband, that he thought was my husband." She also testified that she had initiated contact with police and asked to come to the station to see the videos. So, part of Kitchens' testimony was cumulative of other testimony since Mrs. Ferguson had already testified that Ferguson became a suspect as a result of the video aired on local television. We find it more than highly probable that the admission of the testimony did not contribute to the verdict. See *McKenzie v. State*.[12]

4. In two enumerations, Ferguson contends that the trial court erred in denying his ineffective assistance claim. He asserts that his trial lawyer failed to object to the admission of certain physical and hearsay evidence.

To establish an ineffectiveness claim, an appellant must show not only that his trial counsel's performance was deficient, but also that the deficiency prejudiced him. *Strickland v. Washington*.[13] Failure to satisfy either prong of the *Strickland* standard is fatal to an ineffectiveness claim. *Ward v. State*.[14]

(a) Ferguson contends that his lawyer failed to object to the admission of the surveillance videotapes and a photograph that lacked an adequate foundation. Ferguson claims that the State failed to properly authenticate the tapes, did not establish that the video recorder functioned properly, and failed to show that the tapes accurately depicted the events. Even assuming, arguendo, that the State did not meet all the foundational prerequisites, in light of the overwhelming evidence of his guilt, Ferguson failed to establish the existence of a reasonable probability that the outcome of his trial would have been different but for that deficiency. See *Mency v. State*.[15]

(b) Ferguson complains that his lawyer failed to object to hearsay testimony that undermined his alibi defense. He claims that his wife's testimony about his sister's "devastating statement" that he had told her that he was going to North Carolina to visit their mother's grave contradicted and "ultimately discredited" his alibi defense. The evidence belies this claim.

Ferguson was absent from home and work from the morning of December 31, 1998, until the night of January 5, 1999. His alibi was that during the pertinent times, he was with his friend, Bernard Palmer, with whom he was temporarily living. But none of Ferguson's witnesses could account for his whereabouts on Sunday, the

---

[12] *McKenzie v. State*, 271 Ga. 47, 48-49 (2) (518 SE2d 404) (1999).

[13] *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[14] *Ward v. State*, 242 Ga. App. 246, 248 (2) (529 SE2d 378) (2000).

[15] *Mency v. State*, 228 Ga. App. 640, 642 (2) (492 SE2d 692) (1997).

date of the convenience store crimes. Instead, Ferguson's alibi witnesses offered testimony of dubious value. Palmer testified that the only time Ferguson left was on Sunday. When asked on direct, "[a]nd during that time, did he have an occasion to leave," Palmer responded, "[h]e left — he left Sunday evening — Sunday morning, I think." Betty McClendon, Palmer's sister, testified that after January 1, she had not again seen Ferguson during the weekend. Hattie May Bell, a neighbor of Palmer's, could only say that she had seen Ferguson twice at Palmer's house over the weekend. Whether Ferguson had or had not traveled to North Carolina had no bearing on Ferguson's whereabouts on Sunday. No error was shown.

*Judgment affirmed. Ellington and Phipps, JJ., concur.*

DECIDED JUNE 3, 2003 —
RECONSIDERATION DENIED JUNE 27, 2003 — 

*Bruce S. Harvey, David S. West, Jennifer S. Hanson, David W. Martin*, for appellant.

*Daniel J. Craig, District Attorney, Charles H. Weigle, Charles R. Sheppard, Assistant District Attorneys*, for appellee.